United States Courts
Southern District of Texas
F I L E D

DEC 11 2019

David J. Bradley, Clerk of Court

# Federal Civil Court Houston Tx

# Writ of mandamus objecting judgement at the advisory hearing

### Joseph Costello
### Vrs

## Texas DFPS Tonya Rogers:DonQuetta Simmons:Guardian adlitem JB Bobbit

### Statement of Issues

The trial court terminated Father's parental rights on predicate grounds of endangerment and failure to complete a family service plan. See Tex. Fam. Code Ann. §161.001(b)(1)(E) and(O). The trial court further found that termination of Father's rights was in the child's best interest.

Further research into the case shows DFPS lied several occasions in attempt to conceal the fraudulent misuse of authority.

### Statement of the Case

Parental rights was terminated on speculation claiming predicate grounds of endangerment. The drug test have inconsistencies that and do not match the exhibits on file from what was testified in court. DFPS employees did not follow the standard protocol or procedures that they are required to. Multiple times during the case employees of DFPS overlooked child being abused in foster care. Would not place child with any relatives. Used false statements, incorrect drug test results, outlandish accusations and improper actions for determining the best interest of the child would be unrelated adoption.

### TABLE OF AUTHORITIES

Lassiter v. Dep't of Social Servs., 452 U.S. 18, 27 (1981)
Dallas Ry. &amp; Terminal

*Smith v. Organization of Foster Families for Equal. & Reform,*
**431 U.S. 816, 97 S. Ct. 2094; 53 L.Ed.2d 14 (1977).**

*Debra VV. v. Johnson,* **2nd Dept; 26 A.D.3d 714, 811 N.Y.S.2d 457
(N.Y. App. Div. 2006), also** 1-8 LN Answer Guide NY Family Court
Proceedings § 8.35

Joseph P. (1990, Fam Ct) 148 Misc 2d 25, 559 NYS2d 623.

*Moorhead v. Coss,* 17 A.D.3d 725, 792 N.Y.S.2d 709 (2005)

*Smith v. Organization of Foster Parents,* 431 U.S. 816d, 97 S.Ct.
2094, 53 L.E.2d 14 (1977),

*Matter of Wanda P. v. Monroe County Dept. of Human Servs.,* 10
Misc. 3d 1076(A) (N.Y. Fam. Ct. 2006).

*Metcalf v. Odums,* 35 A.D.3d 865 (N.Y. App. Div. 2d Dep't 2006),

 *Katherine D. v. Lawrence D.,* 32 A.D.3d 1350 (N.Y. App. Div. 4th
Dep't 2006)

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546
U.S. 418, 430-431 (2006).

*Adarand v. Pena,* 515 U.S. 200, 227 (1995)

## Contents

TITLE 8.Sec. 37.01.(2)(A)Sec. 37.03.  AGGRAVATED
PERJURY.(a)(1)(2)Sec. 37.04. MATERIALITY.(c)Sec. 37.06.
INCONSISTENT STATEMENTS.Sec. 37.09. TAMPERING WITH OR
FABRICATING PHYSICAL EVIDENCE.(2)

There was quite a few false statements that resulted in loss of
parental rights, The caseworkers notes do not match the courts

exhibits for the recorded hair follicle results. The inconsistent statements include the vomit incident where JC was being accused of over feeding the child resulting in distress, but then the statement was contradicted when Rogers said the child had her feedings adjusted after that incident. Another issue that has come to the attention is the two hair follicle test that had showed a major spike that was conducted by the clarifying scientist KSSL04, There is questions about the radical swings of the results, JC consulted with a physician they stated the the radical swings like what is documented is very unlikely. There is reason to believe the drug test was tampered with. Since JC has not done any drugs since the birth of the child.

Sec. 261.107.(a)(b) FALSE REPORT; CRIMINAL PENALTY; CIVIL PENALTY.

Caseworker Tonya Rogers sent a photo of Pepsi cans sitting outside my home claiming they was beer cans to LaTronda at the Hands of Healing treatment center. She also told me to attend 10 additional classes that were not court ordered.

Sec. 252.065.(E)(G) ADMINISTRATIVE PENALTY.

The child was given a GTube at the hospital as a secondary form of feeding. Not a primary but for a whole year no one confirmed with the doctor even after JC stated she was eating at the hospital. Finally JC was given contact information to the doctor. The Doctor stated No one never said the child could not eat. The child was given medication to stop vomiting when she did not need it. The care giver was over feeding her.

Sec. 263.102.(8)SERVICE PLAN;

In the service plan it stated for JC to attend all medical visits and get increased visitation. Which was never done, however the case worker Rogers stated that JC did attend all medical visits but she failed to inquire if he could care for the child. This is another example of the lies CPS stated to cover their actions

TITLE 5.SUBTITLE INVESTIGATION OF REPORT OF CHILD ABUSE OR NEGLECT.Sec. 261.001.ii.(a)(b)

After child attended visit with swollen eye and bruising on the face, she maintained in the same home. No one never followed up with the doctors to see what was being said.

Only going by the information given by caregiver.

**SEC. 263.002.(B)  REVIEW OF PLACEMENTS BY COURT; FINDINGS.**

THERE WAS FOUR HOMES THAT STEPPED UP TO GET CHILD TO BE PLACED WITH, THERE WAS A LONG DELAY IN HAVING A HOME STUDY, OR A CONFIRMATION AS TO IF PCA WOULD BE GIVEN, WHEN IN FACT BY THERE WOULD BE SOME FORM OF ASSISTANCE DUE TO HER HAVING GTUBE MEDICAL NEEDS AND SHE DOES GET SOCIAL SECURITY. WHEN THE HOME STUDY WAS FINALLY DONE THERE WAS ALWAYS SOME OUTLANDISH REASON AS TO WHY DFPS WOULD NOT RELEASE THE CHILD. LORIANN COSTELLO SISTER OF JC WAS TOLD CHILD COULD NOT BE PLACED IN HER HOME BECAUSE GC COULD NOT SHARE A ROOM WITH THE 8YR OLD MALE CHILD IN THE HOME. WHEN IN FACT SHE WOULD BE SHARING A ROOM WITH THE FEMALE LIVE IN HOME HEALTH CLIENT. THE NEXT REASON AS TO WHY PLACEMENT was denied CPS claimed Lori Costello would not be able to provide for GC. So Lori Costello then sent pay check stubs proving income. CPS replied with the check stubs were fraud. Then Lori sent in copies of her bank statement and her significant others as well. The final response was the ad litem Bobbit needed to sign off on the documents. Which has yet to take place. There has been a kinship placement for child prior to child going into foster care. The process to get placement approved along with stipulations was too over whelming for the initial relative interested in placement.

**5564.14 CRIMINAL ACTIVITY AND IMPRISONMENT TEXAS FAMILY CODE §161.00(B)(1)(L),(Q),(T)**

THE CRIMES THAT CPS WILL TERMINATE PARENTAL RIGHTS OVER. WHICH JC HAS NEVER HAD ANY OF THESE, HOWEVER HIS PRIOR CONVICTIONS WAS USED AGAINST HIM. THAT WERE TEN YEARS PRIOR TO THE BIRTH OF HIS CHILD AND NONE WAS OF A FELONY.

### nature and Stage of proceeding

Information copied from **M E M O R A N D U M O P I N I O N**
**Fourteenth Court of Appeals NO. 14-18-01114-CV**

A. Department's goal was that Gloria grow up in a home free of abuse and "full of love, nurturing, safety, acceptance and protection." The plan noted that Father appeared to lack knowledge of Gloria's medical condition and its severity.

(*If CPS would have followed through with the four C's assessment recommendations for JC to attend all medical visits and increased visits this would not be an issue. After child attended visit with bruises on her face JC was given phone number to the doctor, he asked about child being able to eat, the doctor stated "No one never said GC could not eat orally. The Gtube was a second form of feeding" so the following visit after JC notified caseworker Rogers of this she gave JC a small bin of apple sauce at the next visit. Later that night he was sent a horrible photo of the child with vomit all over a walker and a swollen cheek claiming he done this to his child by feeding her. The next day JC contacted the doctor again asking "what would cause her to vomit like that" doctors assistant stated "The only way she would vomit like that is being over fed by the Gtube" The case worker then told doctors not to give any more information to the father.)

B. Father also failed to attend Narcotics Anonymous meetings and was discharged unsuccessfully from a relapse prevention program. Rogers testified that the unsuccessful discharge was due to Father's aggressive behavior. Father obtained stable employment and housing. Father visited Gloria and brought her toys, presents, clothes, and shoes. Father completed most of his service plan but failed to obtain a psychological evaluation and a Narcotics Anonymous sponsor. Father also failed to attend Narcotics Anonymous meetings and was discharged unsuccessfully from a relapse prevention program. Rogers testified that the unsuccessful discharge was due to Father's aggressive behavior. Rogers testified that Father consistently tested positive for methamphetamine in his hair, but his urine tests were negative. Father's first positive drug test was in February 2017, shortly after Gloria was born. At that time, the measure of methamphetamine in Father's hair follicle was over 200,000 picograms. Two months later Father again tested positive for methamphetamine in his hair follicle, but the measurement had decreased to 5359 picograms. One month later, in May, the methamphetamine in Father's hair decreased to 4617 picograms. Two months later, in July, the measure of methamphetamine was approximately the same, at 4623 picograms. In October 2017, the measure of methamphetamine in Father's hair increased to 13,136 picograms, indicating an increase in Father's use of methamphetamine. By January 2018, the measurement had decreased again to 4803 picograms. In February 2018, Father's hair and urine tests were negative for methamphetamine. In April 2018, he again tested positive with a measurement of 2242 picograms. The measure of methamphetamine in Father's hair went down at the beginning of the case but went up while the case was pending, indicating a relapse. From February 2017 through April 2018, Father consistently tested positive for methamphetamine in his hair follicle with the exception of the February 2018 negative test. Rogers testified that

Father's drug tests reflected continuous use of methamphetamine through the pendency of the case.

Information recorded from REPORTER'S RECORD VOLUME 3 OF 7 VOLUMES TRIAL COURT CAUSE NO. 2017-03667J
(* The drug test for Feb 2018 does not show a negative test result in the hair according to the exhibits Amp-144 picograms Meth-4823 picograms Clarifying scientist KSSL04 is also the person who done the Oct 2017 hair follicle which has two results for the same month ironically)

C. Father showed no awareness as to how his drug use affected his ability to be a parent. Father did not understand Gloria's medical needs and Department determined it would be dangerous for Gloria to be returned to him. Gloria's long-term prognosis is positive if her special medical needs are met.

Copied from <strong>BRIEF OF APPELLANT J.C.</strong>

**D. P-4:** Father's drug testing results, **(RR 3, p. 19-48)**, accompanied by Business Record Affidavit, from Texas Alcohol and Drug Testing Service, reflecting the following:

E. Random urinalyses analyzed on February 10, 2017; Negative results. **(RR 3, p. 24-27)**.

Hair Follicle test analyzed on February 10, 2017; Positive results for Methamphetamines 13498 pg/mg and Amphetamines 202292. **(RR 3, p. 28--32)**.

F. Random urinalyses analyzed on April 7, 2017; Negative results. **(RR 3, p. 35)**.

Hair Follicle test analyzed on April 7, 2017; Positive results for Methamphetamines 301 pg/mg and Amphetamines 5359 pg/mg. **(RR 3, p. 36-39)**.

G. Random urinalyses analyzed on June 20, 2017; Negative results. **(RR 3, p. 40-43)**.

Hair Follicle test analyzed on June 20, 2017; Positive results for Methamphetamines 4617 pg/mg. **(RR 3, p. 44-48)**.

H. **P-9:**   Medical Records: Father's 4-C's assessment, accompanied with a business record affidavit. **(RR 3, p. 88-99)**.

**P-10:**   Father's drug testing results reflecting the following: Business Record Affidavit from Texas Alcohol and Drug Testing Service along with the following drug test result:

I. Hair Follicle test analyzed on October 11, 2017; Positive results for Ethyl Glucuronide (alcohol), Methamphetamines 13163 pg/mg and Amphetamines 233. **(RR 3, p. 100-109)**.

**P-11:**   Father's drug testing results accompanied with a business records affidavit reflecting the following:

J. Hair Follicle test analyzed on October 11, 2017; Positive results for Ethyl Glucuronide (alcohol), Methamphetamines 4823 pg/mg and Amphetamines 138. **(RR 3, p. 110-119)**.

K. **P-12:** Father's drug testing results accompanied with a business record affidavit reflecting the following: Hair Follicle test analyzed on February 4, 2018; Negative results for Ethyl Glucuronide (alcohol), positive results for Methamphetamines 2242 pg/mg and Amphetamines 161. **(RR 3, p. 119-127)**.

**P-15:** Father's drug testing results accompanied with a business record affidavit reflecting the following:

L. Hair Follicle test analyzed on April 18, 2018; Negative results for Ethyl Glucuronide (alcohol), positive results for Methamphetamines 4803 pg/mg and Amphetamines 144. **(RR 3, p. 156-165)**.

M. June 20th, 2017: hair follicle; positive for methamphetamines only and negative in urinalysis. **(RR 2, p. 11)**.

June 20th, 2017: hair follicle; positive for methamphetamines and amphetamines, but negative in urinalysis. **(RR 3, p. 11)**.

N. October 3, 2017: hair follicle; positive for methamphetamines and amphetamines, but negative in urinalysis. The caseworker confirmed the Father's level increased from 4823 to 13,136 picograms. **(RR 2, p. 12)**.

O. Lastly, the caseworker covered J.C.'s criminal history including:

Misdemeanor Possession of Marijuana in December of 2004. **(RR 2, p. 14)**;

Misdemeanor Driving While License Suspended in June of 2005. **(RR 3, p.14)**;

Misdemeanor Driving While Intoxicated in April of 2006. **(RR 2, p. 14)**;

Misdemeanor Possession of Marijuana in January of 2007. **(RR 2, p. 14)**;

Misdemeanor Driving Without a License in April of 2008. **(RR 2, p. 14)**;

Assault Family-Violence involving a nephew in June of 2008. **(RR 2, p. 15)**;

Reference to a conviction for Deadly Conduct. However, the caseworker was unaware of any pertinent facts regarding this charge, nor could Appellant counsel locate a judgement in evidence or the clerk's record. **(RR 2, p. 15)**.

DFPS also asserts J.C.'s criminal history is a continuing danger to the child, which also supports a finding under subsection *(E)*. **(RR 2 p. 14-15)**. However, the record pertaining to J.C.'s criminal history involves only misdemeanor charges which occurred between 2004 and 2008, a decade prior to the birth of his child. **(DFPS Exhibits P-18 through P-23)**. Although the removal affidavit references a 2010 Deadly Conduct charge, no such judgment appears in evidence or the clerk's

file. More importantly, the caseworker testified she was unaware of the charge.

Regarding subsection *(O)* grounds, a preponderance of the evidence shows that Father's failure, if any, to comply with his family service plan was due to inability, not attributable to any fault of his own, and that he made a good faith effort to comply. *Tex. Fam Code, 161.001(d)*. In fact, Father did additional service, which were not required under the terms of his Family Service Plan. Therefore, the *(O)*ground for termination should not stand.

Appellant argues expert testimony was absolutely necessary to explain the radical swings of picogram levels and to determine when the last possible time the Appellant used illegal drugs. Absent from the caseworker's testimony was any mention of the quantity and timeframe of when drug usage occurred. Appellant argues a competent witness, properly credentialed, would have interpreted the results in a manner confirming no recent use, thereby invalidating a subsection *(E)*finding. Accordingly, DFPS did not conclusively establish continuing drug usages by the Father.

Appellant asserts DFPS failed to offer competent testimony interpreting the aforementioned drug-test results. The caseworker admits she testified from a permanency report and not the actual drugs tests included in the agency's exhibits.

It is undisputed the Father had no other instances of missing scheduled appointments, or services, including drug testing and was diligently working services when this minor disagreement occurred. It is also clear J.C. complete most, if not all the tasks outlined in his plan. Most significantly, there is absolutely no evidence, or testimony alleging threats, violence or any physical altercation whatsoever on behalf of the Father that permit an unsuccessful dismissal from the program on the basis of "aggressiveness." Despite being fully aware of J.C.'s predicament, and lack of evidence to the contrary, DFPS takes the absurd position the Father's conduct was "aggressive" and thereby warrants the loss of his child for failing to complete his Family Service Plan.

Information copied from APPELLATE NO. 14-18-01114-CV
REPORTER'S RECORD VOLUME 1 OF 1 VOLUMES TRIAL COURT CAUSE NO. 2017-03667J

MR. BOBBITT: Judge, I like the current placement. I've been in touch with the relatives that were identified by the father. There is a pending home study. I intend to get out there. I think that it's -- Gracee's health has greatly improved over the past six months, and I've not -- she's in a primary medical needs home. And it doesn't appear to me as though she's going to need that for the rest of her life, so...
THE COURT: All right. I will approve the placement. Movement with ad litem approval.

BY MR. GEORGE: COURTNEY GREENWAY,
Q. You're aware that the father did not test positive on the last drug test, correct?

A. I am aware, yes.
Q. And if he's not testing positive again today, are you still recommending a 12-step program?
A. I am still recommending a 12-step program.
Q. And the basis for that is?
A. The basis for that is that he has informed me that he used methamphetamines for five years, and it was still testing positive up until this most recent drug test. So I would like to see more lasting sobriety as well as a few more classes.

## Prayer for relief

 The prayer for relief is that the case be looked over again to address the current issues, along with **appropriate action to the Child Protective Service agents who wrongfully** terminated parental rights of JC Costello, JB Bobbit, Tonya Rogers, Don Quetta Simmons, Nicole Franko.

Prayer for Regina Besongs foster home facility licenses to be removed. Due to the repeated abuse the child had to endure. For a person who specializes in infants with special needs the victims can not speak for themselves so someone will have to do it for them and the evidence shows physical abuse more than one time. However one time is too many.